**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SERRY PARK,<br>PLAINTIFF,<br>V.<br>FIGMA, INC. AND DYLAN FIELD,<br>DEFENDANTS. | **COMPLAINT**<br>**JURY TRIAL DEMANDED** |

Plaintiff Serry Park, represented by Seppinni Law, alleges upon personal knowledge as to herself and her own acts and experiences, and upon information and belief as to all other facts:

## INTRODUCTION

1. Figma has a sexual harassment problem, and CEO and Chairman Dylan Field has done nothing to fix it.

2. Shortly after Serry Park joined Figma as a Software Engineer, her Onboarding Mentor began sexually harassing her, including by stalking her and making unwanted sexual advances. Park repeatedly told him no. But he wouldn't listen, and he wouldn't leave her alone.

3. When Park tried to keep her head down and avoid him, her manager, Jon Emerson, scolded her for not being a team player, and questioned her commitment to Figma.

4. And when she reported this sexual harassment, Emerson dismissed her complaints and accused her of overreacting. He and Figma did nothing to intervene, discipline her Onboarding Mentor, or stop the harassment.

5. Worse, when Park asked to be kept off his projects, Figma forced her to continue working with him, and instructed her to fix his harassment herself, by confronting him one-on-one. And Emerson told her if she couldn't handle working with him, she should leave.

6. When Erik Froese replaced Emerson as Park's manager, Park briefed him on the sexual harassment and asked to be separated from her Onboarding Mentor. Froese—like Emerson—brushed her off, downplayed the harassment, and told her he wouldn't separate them. Then he shamed her, saying he expected someone at her level to be better at resolving "conflict," and punished her with a retaliatory negative performance review and rating—based on her failure to "speak up" and confront her harasser.

7. All the while, the harassment continued. And where Figma repeatedly refused to help her, and kept putting her in harm's way, Park felt she had no choice but to leave her team—just as Emerson had told her.

8. But Park's forced departure to a new team effectively destroyed her career, setting her back years and derailing a promotion she should've gotten while slashing her future salary, bonus, and equity, all because she reported sexual harassment.

9. Park thought it couldn't get worse, but then her new manager, Mónica Goren, sexually harassed her too, including by spreading sexual lies about her and making sexual jokes about her—at work, in front of several of their colleagues.

10. When one of Park's colleagues reported Goren's sexual harassment to the head of HR for the engineering team, Bryan Walker, Walker pulled from the same playbook Emerson and Froese had used—he dismissed the harassment complaints, failed to investigate, and told Park she had to confront Goren herself, alone.

11. Then, Goren retaliated, targeting Park with bullying and harassment so intense her colleagues had to intervene, and blindsiding her with unearned negative performance ratings. And Goren, like Froese before her, treated Park worse because she is an Asian woman.

12. When Park reported the retaliation, Figma and Walker did nothing, other than tell her *again* to confront Goren herself. All the while, Goren's harassment continued, unchecked.

13. In her few years at Figma, Park suffered repeated sexual harassment, and every time she reported it—across different teams, to multiple managers, and to HR—she got the same response: buck up and deal with it yourself. And then, she got punished.

14. Figma's refusal to keep Park and other victims safe, and its steadfast commitment to protecting and empowering sexual harassers while allowing them to retaliate, caused Park severe harms—a career wipeout, from which she won't recover, and extreme psychological damage, triggering PTSD symptoms and requiring months-long medical leave.

15. This comes from the top: Figma's Confront-Your-Harasser Policy reflects the "direct feedback" culture that CEO Dylan Field chose, publishes, and enforces—and he has kept it in place to promote personal "growth" for wrongdoers, at victims' expense.

16. Park won't be silenced.

## JURISDICTION AND VENUE

17. The Court has subject-matter jurisdiction under 28 U.S.C. § 1331 because Plaintiff's claims arise under federal law.

18. The Court has supplemental jurisdiction over Plaintiff's state and local law claims under 28 U.S.C. § 1367(a). Plaintiff's state and local law claims derive from the same common nucleus of operative fact as the federal claims and form part of the same case or controversy.

19. The Court has subject-matter jurisdiction under 28 U.S.C. § 1332(a) because the parties are completely diverse in citizenship, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

20. Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this District.

## ADMINISTRATIVE PROCEDURES

21. Plaintiff will file a Charge of Discrimination under Title VII and the ADA with the Equal Employment Opportunity Commission (EEOC). Upon receiving the Notice of Right to Sue (NRTS), Plaintiff will promptly amend or seek leave to amend this Complaint to add relevant federal claims.

22. To comply with New York City Administrative Code § 8-502(c), Plaintiff will serve a copy of this Complaint on the New York City Commission on Human Rights and the Corporation Counsel of the City of New York within 10 days of filing this action.

## THE PARTIES

23. Plaintiff Serry Park is a citizen of New York. From October 2022 to the present, Defendants have employed Plaintiff. At all relevant times, Plaintiff was an "employee" within the meaning of all relevant statutes.

24. Defendant Figma, Inc. is a Delaware corporation with its principal place of business located at 760 Market Street, Floor 10, San Francisco, California 94102. At all relevant times, Figma was Plaintiff's "employer" within the meaning of all relevant statutes. Figma directed, controlled, and compensated Plaintiff's work. At all relevant times, Figma employed 15 or more employees for each working day in each of 20 or more calendar weeks in the current or preceding calendar year. At all relevant times, Figma was an enterprise engaged in interstate commerce or in the production of goods for commerce and had an annual gross volume of sales made or business done of not less than $500,000.

25. Defendant Dylan Field is a citizen of California. Field is CEO, Chairman, and Co-Founder of Figma. During the relevant period, Field exercised active operational control over the company, possessed the power to hire and fire Park, supervised Park's work schedules and conditions of employment, and determined Park's rate and method of pay. Accordingly, Field is an "employer" subject to individual liability under the relevant laws. Field transacts business in New York through Figma, which operates a Manhattan office employing hundreds of people, including Park, for Field's benefit, with his knowledge and consent, and under his control. Park's claims against Field arise from that business. The Confront-Your-Harasser Policy that Field created, maintains, and enforces was applied to Park, a New York City employee, in New York, and injured her in New York. Field is also Figma's President and the Chair of its Board of Directors, and he controls a majority of Figma's voting power.

## THE FACTS

### 1. Park brings extensive software engineering expertise and a history of high-impact execution to Figma.

26. Serry Park is a highly credentialed software engineer with a record of scaling critical infrastructure at top technology companies.

27. She earned her Bachelor of Arts from Wellesley College, completed cross-registered coursework in Electrical Engineering and Computer Science at MIT, and advanced her technical training through Master's-level Computer Science coursework at the University of Texas at Austin.

28. She also volunteered with the Last Mile/Next Chapter to teach incarcerated people how to code.

29. Before joining Figma in 2022, Park designed backend systems and drove massive scaling efforts for well-known software brands.

30. For example, during her four-year tenure at Slack, she was awarded a U.S. Patent (No. 11,711,435) for architecting an innovative group-based communication system that managed interactions with remote data resources.

31. She also expanded the software's database infrastructure to support 12 million daily active users during the unprecedented global shift to remote work.

32. Then, Sea Foundry hired Park as Founding Engineer.

33. She helped secure over $800,000 in funding during her tenure there.

34. Park also worked as a Staff Backend Engineer at Zipper, where she led core product development.

35. Put simply: Park is a world-class software engineer.

### 2. Park's Figma Onboarding Mentor sexually harasses her.

36. Figma hired Park in October 2022 to bring her infrastructure expertise to the FigFile Platform team.

37. Figma thrust Park into a male-dominated environment: her 13-or-so-person team included just three women. Every manager was a man.

38. Right after Park arrived, her team's Onboarding Mentor began sexually harassing her.

39. About three weeks into her tenure, at the end of a long Zoom work call, he asked Park to stay on so he "could talk to [her] about something."

40. Despite never having met Park in person, he announced he felt a "connection" with her and asked if she would go on a date with him.

41. Park refused, explaining she wanted to focus on her work and maintain a professional relationship with her team.

42. Still, her Onboarding Mentor escalated the pressure.

43. He told her he was at the point in his career "where I don't really care where I end up," explicitly offering to abandon the FigFile team if Park agreed to go out with him.

44. Again, Park said no.

45. But he refused to back down. He ended the call telling her she should "think about it."

46. After the call, Park felt humiliated, demeaned, and trapped.

47. That should've been the end of it. But her Onboarding Mentor kept pursuing her.

48. At Figma's holiday party in December 2022, he ramped up the harassment—he stared at Park, all night; stalked her; and followed her to her table, choosing to sit beside her.

49. Park felt like she couldn't escape.

50. Her Onboarding Mentor's continued pursuits caused Park to feel distressed, anxious, and uncomfortable, and to fear for her career and her safety.

51. It was clear he hadn't accepted her "no" and that he would keep chasing her.

52. Her Onboarding Mentor's behavior that night was so glaring that Park's "plus one" noticed it, warning Park that he kept looking at her, and sharing her alarm that he wouldn't leave her alone.

53. This harassment weighed on Park, making it difficult for her to focus at work, and causing her to feel shame and unease.

54. Still, she cared about her work, and did her best to learn on her own, to have as few interactions with her Onboarding Mentor as possible.

55. Because Park was one of only a few women on a male-dominated team and was early in her career at Figma, she was afraid to report the harassment.

56. She worried her managers would dismiss her reports or view her as the problem.

57. She was right to worry.

### 3. When Park reports sexual harassment, Figma dismisses and shames her, does nothing to fix the harassment or discipline the wrongdoer, and forces her to confront her harasser herself, one-on-one.

58. Shortly after the holiday party, Park tried to manage the situation herself by delaying her project selections from a team sign-up list, hoping to pick an assignment her Onboarding Mentor had not chosen.

59. But he also delayed his selection.

60. So, Park's manager, Jon Emerson, confronted Park about her delay and **questioned her commitment to her group and its work**.

61. Cornered, Park reported the sexual harassment to Emerson, telling him she had delayed selections only so that she could avoid her harasser.

62. At the same time, she'd reached a point where she couldn't manage alone anymore and needed help from her manager. Park was hopeful Emerson would have a solution.

63. But rather than support Park, Emerson sided with her harasser, excused his harassment, and dismissed Park's complaints out of hand.

64. At the outset, Emerson told Park, "**I'm trying to decide if this is a problem**," as if it were up to him to determine whether the sexual harassment she'd suffered and reported was "bad" enough to take seriously.

65. Emerson then added that he "**had met [his] wife at work <u>too</u>**," suggesting that what Park had experienced wasn't sexual harassment at all, that she was overreacting, and that she should take a chance on her harasser, even though she'd made clear to Emerson she wasn't interested and that her harasser's advances made her uncomfortable.

66. In short, he'd decided this sexual harassment wasn't a "problem" at all, and recast it as harmless flirtation, all in good fun.

67. Emerson then told Park that if she was unhappy, **she should just transfer teams**.

68. Park was stunned.

69. Emerson's message was clear—*boys will be boys*, Park should be flattered by the workplace sexual attention, and if she couldn't handle a little flirting, she should leave.

70. Emerson, she realized, wouldn't help her. If she wanted to escape the sexual harassment, it was on her. As she'd feared, Figma thought *she* was the problem, not her harasser.

71. Of course, Park didn't want to transfer teams. She had worked hard to get where she was, she liked her team, and she knew she deserved to be on it.

72. But she knew she couldn't endure ongoing sexual harassment. And now, she knew Emerson and Figma saw no issue with the harassment; they would continue to make excuses for her harasser and stand by him—at her expense. After all, Emerson had suggested she might end up marrying her harasser.

73. In a follow-up call, Emerson backtracked, adopting a temporarily receptive tone.

74. He claimed Figma wanted to ensure her safety and asked how the company could help.

75. Park was surprised by this question. She had assumed Figma had some kind of sexual harassment policy in place and found it strange that Figma asked *her* what to do.

76. Still, she made a simple, commonsense request—that management keep her off projects with her harasser.

77. But despite saying it wanted to keep Park safe, Figma ignored her request and, instead, did the opposite.

78. Rather than separate them (or do anything to discipline the harasser), Figma's HR instructed Park to confront her harasser *herself* and explain why his sexual harassment made her uncomfortable.

79. Of course, this put Park in harm's way.

80. Her harasser was erratic, and he'd shown no sign of giving up his pursuit of Park, or leaving her alone, no matter that she'd told him no.

81. His repeated and unwanted sexual advances sickened and frightened Park. She worried about what he might do next—particularly now that Figma had done nothing to discipline him—and she badly wanted to be separated from him.

82. What's more, she already *had* confronted him—having rejected his advances several times, in one-on-one conversations.

83. There was no way another conversation would convince him to stop.

84. She needed HR intervention, and they refused to give it.

85. Figma's unsound Confront-Your-Harasser Policy exposed Park to danger, including increased sexual harassment and stalking.

86. It's clear Figma and Field have no interest in holding sexual harassers to account, or in stopping workplace sexual harassment.

87. Instead, Figma and Field want to stop harassment *complaints*, having selected a policy (both written and unwritten) most likely to punish those victims who speak up, and to deter future harassment reports.

88. Where Figma's approach to sexual harassment involves *forcing victims to be alone with their harassers*, and little else, why would anyone come forward?

89. Figma's harassment victims are better off saying nothing. And that's exactly what Figma and Field want.

90. Park felt stuck—she'd asked for help avoiding her harasser, and Figma refused.

91. At this point, Park thought it couldn't get worse.

92. She was wrong.

### 4. Figma punishes Park for reporting the harassment, including by demoting her.

93. In March 2023, Figma assigned Park to lead her first significant project on the FigFile team.

94. This was a short time after Park went to Emerson and pleaded that she and her harasser not be assigned to the same projects.

95. But when the project needed additional engineering support, Emerson ignored Park's complaints and assigned her harasser to Park's team.

96. After placing her harasser directly under her supervision—despite her complaints—Emerson asked Park, "**Oh, you're okay with him being on, right**?"

97. Park saw no way out.

98. Emerson was her manager. And he'd chastised her once before for not being a team player, when she delayed her selections and reported sexual harassment.

99. Park knew Emerson thought she was oversensitive; he'd dismissed her complaints as frivolous, and considered her an inconvenience—to Emerson, her plea to be separated from her harasser was a threat to the project, and he punished her for it.

100. Seeing no other option, and not wanting to abandon her project or risk hurting her career more—or give Emerson more reason to doubt her—she told him she'd "figure it out."

101. Emerson did nothing.

102. And Park's work and health suffered.

103. Because Emerson had added her harasser to her project, Park had to actively avoid specific work to reduce her direct interactions with him.

104. She also became increasingly withdrawn—she kept her camera turned off in Zoom meetings and stayed quieter than she'd been before.

105. She felt trapped. She badly wanted to focus on her work and actively participate in team meetings, and she was haunted by Emerson's feedback that she wasn't a team player. But she couldn't bear the forced interactions with her harasser.

106. Around the same time, Figma promoted Emerson and replaced him with Erik Froese.

107. During an introductory call with Froese, Park briefed Froese on the sexual harassment.

108. She asked Froese to keep her harasser off her projects.

109. Although his initial responsiveness gave Park a glimmer of hope, Froese quickly reversed course.

110. In their second conversation, he told Park that at her "level," she should easily be able to resolve "conflict" with her teammates.

111. He told her that **transferring her harasser or separating them would just be "avoiding the problem" and not "solving" it**.

112. This was the same message she'd received from Emerson—buck up, be a team player, and deal with the harassment yourself.

113. At Figma, sexual harassment is just a part of coming to work, like a disagreement among colleagues, or some social friction to be resolved through "conflict resolution."

114. But this wasn't "conflict." This was unchecked, ongoing sexual harassment. It can't be managed through conversation (though Park tried).

115. Park was shattered—she'd reported sexual harassment to her manager, and in response he told her to grow up and get a thicker skin.

116. Froese's comments were rooted in sexist and racist stereotypes about Asian women—that they're meek, timid, and conflict-averse.

117. **Then, Froese—*like Emerson*—said that he too had met his partner at work**.

118. Park couldn't wrap her head around this. Like Emerson, Froese downplayed the sexual harassment, recasting it as benign, charming, and romantic, no matter that Park had told him it wasn't consensual, and no matter that, at this point, Park already was dating someone (her now wife).

119. Park felt hurt, isolated, and distressed.

120. The sexual harassment, and now Figma's repeated refusals to intervene—and its insistence on blaming *her* for it—created a hostile work environment that severely impaired Park's mental health.

121. It was clear to Park that things would not improve under Froese.

122. She feared for her safety and was desperate to escape.

123. So, seeing no other option, and as Emerson had told her to, in April 2024, Park transferred to Figma's Extensibility team.

124. This was an effective demotion, with significant costs to Park's career, reputation, and compensation.

125. The transfer restarted the clock on Park's performance and promotion tracks, setting her back years, and forcing her to start over. She had to abandon the progress she'd made on her old team and learn a new technical area.

126. The transfer also derailed a promotion—from Level 3 to Level 4—that Park would've been eligible for, and should have received, that year, 2024.

127. And it effectively slashed her future salary, bonus eligibility, and equity grants, costing her millions of dollars over the course of her career.

128. In other words, Figma's refusal to do anything in response to her sexual harassment complaints carried severe, compounding professional consequences for Park.

### 4.1. All the while, Park continues experiencing sexual harassment at Figma.

129. Park's harasser kept at it throughout 2023—he saw her at a New York City offsite, and sent her repeated unsolicited text messages that night, after she left.

130. Park blocked him.

131. And he did it again, at another New York City offsite, where, again, he repeatedly paced back and forth past her desk to stare at her, leaving her feeling anxious and on edge.

132. Kimber Fong, Park's now wife, was there, and witnessed this dogged pursuit and how uncomfortable Park was.

133. Park's harasser looked for any excuse to be close to her, including by joining a boardgame among Park and her coworkers, at that same offsite, when he wasn't wanted and hadn't been invited.

134. He sat down, unwelcome, and yelled at the table.

135. Park's coworker, D.T., who was present, noted how uncomfortable and awkward the interaction was.

136. This ongoing harassment weighed on Park, making it difficult for her to focus on her work, and causing her to feel shame, anxiety, and unease.

137. It's no surprise that the sexual harassment continued. Figma never told him to stop.

138. Park's harasser still works at Figma.

### 4.2. Figma gives Park a retaliatory negative performance review and rating, and puts her on a "coaching plan."

139. Park's transition to her new team coincided with the performance review cycle.

140. In delivering her performance review, Froese criticized Park for not speaking up enough, and for lacking "presence."

141. This was precisely the kind of racially-coded feedback Froese had shared with her before, and that she'd received from Emerson, too—that she was conflict-avoidant and unassertive, and should "confront" problems—including her harasser—head on, including by speaking up.

142. Again, this feedback was grounded in racist, sexist stereotypes about Asian women, including that they are submissive and passive.

143. Her performance review said the same, flagging that she should "participate more" and "engage with others." But Froese knew, or should've known, how difficult it'd been for Park to engage and contribute, in team settings, where he'd forced her to work directly with her harasser, and that she'd pulled back from participating to avoid him.

144. Froese recommended rating Park a 2 out of 5 ("inconsistent"), and Park's new manager, R.D., deferred to Froese's recommended rating, issued her an "inconsistent" rating, and then put her on a coaching plan (because of her low rating), which she completed in September and October 2024.

145. For its part, the coaching plan belabored minor points for which other employees wouldn't have been disciplined.

146. It had become clear to Park that her complaints to HR and management about sexual harassment, and her responses to the harassment, had factored into—and harmed—her performance review.

147. Figma was punishing Park both for (1) trying to manage the sexual harassment on her own, by avoiding her harasser (not a team player, participate and engage more) and for (2) reporting his harassment to management (conflict-averse, you need to handle this yourself, through one-on-one confrontation).

### 5. Park's mentors and managers document her strong performance in H1 2025.

148. In November 2024, Mónica Goren joined Figma and replaced R.D. as Park's manager on the Extensibility team.

149. In 2025, Park worked on the Webhooks Scalability and REST API Scalability projects.

150. Figma's infrastructure for sending system alerts and REST API reliability and performance were in bad shape.

151. Park got to work.

152. Park's H1 2025 performance review was overwhelmingly positive.

153. It highlighted her emergence as a technical leader on the Extensibility team.

154. Her colleagues gave her high praise, particularly regarding her work on the Webhooks Scalability and REST API Caching projects.

155. J.L., one of Figma's seniormost engineers, was "impressed" with Park.

156. He noted, among other things, that "Serry was a crucial addition to the team," brought a "good understanding of distributed systems, databases, and operational metrics," and had "domain knowledge that nobody else on the team ha[d]."

157. I.T. praised her for doing "a great job of architecting the initial phases of the webhooks project," adding that reading her documentation "was a great way to catch up and find impactful work," and that he was "inspired by her attention to detail and her commitment to quality."

158. A.M. commended her for creating a "tightly-scoped engineering plan that I'm confident will deliver the expected results in a reasonable amount of time."

159. G.L. emphasized that the caching workstreams "really benefited from Serry's experience in this area."

160. G.L. and A.M. also applauded Park's good communication and overall process.

161. Park's manager, Goren, echoed this praise.

162. She wrote that Park's recent projects "showcase her craft, technical due diligence, experience and emerging leadership on the team."

163. Goren highlighted Park's technical expertise, clean code abstraction, and helpful diligence during on-call shifts.

164. She noted how impressed she was when Park jumped in to help as a core contributor on the FPL Migrations project and "quickly came up to speed and had great velocity," despite Park's primary background in backend development.

165. Goren also commended Park's mentorship and technical community leadership in reviving team Tech Talks.

166. Goren rated Park's overall performance for H1 2025 as "On Track."

167. She elaborated:

> I am very happy to say that Serry is "on track" and overall meeting expectations given the work she has demonstrated in the past 4 months. The projects [] showcase her craft, technical due diligence, experience and emerging leadership on the team. I am pleased with the progress and hope we can continue to build a professional supportive, open & authentic relationship based on trust.

168. At the time, Park felt she was thriving on the Extensibility team. Although the transition had been a significant career setback, Park felt safer now that she was on a team with more women, and she no longer had to work directly with her harasser.

169. She regained some of the confidence she'd lost on her old team and for the first time was able to fully participate, focus, and be herself.

170. But all that changed when Goren turned on her.

### 6. Park excels despite Goren's attempts to undermine her; Goren comments that Park is building a "lawyer" case.

171. In late summer 2025, Goren's poor management began obstructing Park's work.

172. Park took the lead on the complex "Plan Access Tokens" project, single-handedly transforming an ambiguous roadmap into a clear, actionable initiative.

173. She independently proposed the architecture, shopped the design for feedback, and led team engineering critiques to align the group.

174. Her execution was so successful that the work was elevated to a top-priority project for Figma's entire Build Pillar.

175. Yet, rather than support Park, Goren caused bottlenecks.

176. Goren imposed shifting timelines and arrived at technical meetings unprepared.

177. Park's coworkers routinely complained that Goren's lack of technical depth slowed down projects, restricted communication, and violated Figma's core value of empowering project leads to "run with it."

178. Park responded to Goren's behavior professionally. First, she tried to raise her concerns with Goren directly. When this didn't work, she documented her concerns in Figma's Lattice feedback system and sought guidance from her skip-level manager, Rick Fulton. She also shared this feedback with Tommy MacWilliam, when he replaced Fulton.

179. Rather than accept the feedback, Goren became defensive.

180. On August 27, 2025, Goren confronted Park in a one-on-one.

181. Goren told Park that Park's comments to Fulton and her feedback on Lattice made Goren feel like Park was "building a lawyer case" against her.

182. Even so, Goren could not dispute the objective quality of Park's work.

183. In October 2025, Goren issued Park's H2 performance review and rated her "On Track."

184. In the evaluation, Goren wrote that Park "shines on being collaborative" and praised her for "bringing clarity to projects" and her "great attention to detail."

185. Goren also commended Park's technical execution and leadership on the Plan Access Tokens project.

186. Goren noted that Park had "increased her impact this year seizing opportunities to deliver more wins."

187. Her teammates agreed.

188. B.G. noted that Park "was a great partner to work with," had "good intuitions about the right thing to do," and that he "deeply appreciated Serry's focus on [their] high-urgency timeline and her ability to digest the business use case."

189. M.L. highlighted that "[he] couldn't wish for a better partner on plan access tokens work than Serry," that "Serry went above and beyond," and that "[b]ecause of Serry's attention to detail and high agency, [they] were able to lift quite a few limitations."

190. Senior engineer R.F. commended Park for "bringing a TON of clarity to the goals" of "the most ambiguous project on the team's roadmap."

191. P.N. praised Park for showing strong initiative by "deeply investigating use cases, asking clarifying questions, and helping reframe the problem space."

192. And A.M. highlighted her "hustle and frequent communication" on the Plan Access Tokens project.

### 7. Goren sexually harasses Park.

193. In October 2025, Figma held a company offsite lunch in New York City.

194. The night before, Park and her wife, Fong, went out to drinks with members of Park's team, including Goren and A.F.

195. To Park, the drinks were friendly, but professional.

196. Goren and Fong spoke briefly before Goren left.

197. At the offsite lunch the next day, Park, Goren, A.F., and others were talking.

198. One of Park's coworkers asked about drinks the night before.

199. Someone responded that it was "fun" and that "Kimber [Park's wife] was there."

200. When the coworker asked what they had talked about over drinks the night before, Goren blurted, "Oh, Kimber and Serry having sex!"

201. Park and her colleagues were shocked. No one knew what to say.

202. No such conversation had taken place the night before—at least not in Park's or Fong's presence.

203. One of two things happened: either Goren disclosed that she spoke about Park and Fong having sex in front of Park's coworkers at work drinks (and behind their backs), or she made a vulgar sexual "joke" about them, trading on—and perpetuating—a stereotype that queer women are hypersexual (i.e., suggesting that where there was a conversation involving Park and her wife, the only thing they could've been talking about was "having sex").

204. Either way, Goren's comments were harassing and discriminatory, revealing an ugly bias against Park, including a fetishization of queer relationships, and an eagerness to smear and demean her.

205. Park was horrified and humiliated.

206. Park was panicked that her manager might've been spreading sexual lies about Park and her wife to her coworkers, or that her coworkers might think *she* (Park) had been talking about sex (and her own sex life) at work drinks.

207. When Park got up from the table to get more food, a coworker followed her and asked if she was okay, telling her that what Goren had said was inappropriate and hurtful.

208. A.F., too, was appalled by Goren's "joke."

209. Figma had recently conducted a harassment training for its employees, with the motto "if you see something, say something."

210. So, A.F. decided to report Goren's sexual harassment to HR.

## 8. Figma HR dismisses third-party reports of Goren's harassment, sides with Goren, and, again, forces Park to confront her harasser.

211. A.F.'s report went through HR and eventually was relayed to Goren.

212. On November 13, 2025, Goren contacted Park via Slack, saying "someone flagged to Tommy that I made a comment during the offsite that made you uncomfortable about your partner. Im [sic] so sorry that happened[.] Not recalling which LMK[.]"

213. Not knowing how to respond, Park sought guidance from Figma HR's Bryan Walker.

214. Walker said Goren "should not have sent that over Slack."

215. Still, in keeping with Figma's Confront-Your-Harasser Policy, Walker told Park she should contact Goren *herself* and tell her how she felt—just as Emerson, Froese, and HR had told her when Park reported earlier sexual harassment.

216. Rather than shield Park from further harm, Walker forced her to confront Goren directly.

217. It was obvious to Park, by now, that Figma had a pattern-and-practice of requiring victims to face their harassers head-on, alone (Walker was the *third* leader to tell her to confront her harasser). Park was sure this wasn't the first time Figma deployed its Confront-Your-Harasser approach to punish and push out harassment victims, and it wouldn't be the last.

218. When Goren and Park met, at first, Goren claimed she didn't remember the conversation and asked Park to walk her through it.

219. When Park did, Goren denied ever making the comment, saying she didn't remember anything.

220. She then asked who else at the table had heard it, in an apparent attempt to learn who reported her to HR.

221. Then, Goren started scrambling, brainstorming various words and phrases she could've or might've said instead of "sex."

222. Ultimately, she landed on "SEVs," telling Park—after first not remembering and then trying on several other words—that that must've been what she said, as, according to Goren, that's what made most sense in the context, "Kimber and Serry having SEVs."

223. "SEV" is software-engineer shorthand for "severity," which is used to rate an unexpected disruption or outage of an application, like a server error or crash.

224. Goren now claimed that she had been referencing a comment Fong made about Park's focus during "SEV" incidents.

225. Park was astounded. Goren's telling made no sense.

226. Not only is it inconceivable that anyone—let alone an entire group—would mistake "sex" for "SEVs," but the phrase "having SEVs" does not even exist and is never used.

227. What's more, neither Park nor Fong recalled ever talking with Goren about incident focus. And Fong isn't a software engineer. Her job doesn't involve "SEVs."

228. Rather than take accountability, Goren spent the conversation on the defensive and told Park she never would have made such a comment because she "has a lot of gay friends."

229. Park left the conversation feeling crushed, anxious, and vulnerable.

230. After the conversation, Goren messaged Walker and MacWilliam to say that she and Park had agreed it had been a "misunderstanding," which was a lie.

231. The next day, November 14, based on Goren's message, and without confirming its truth with Park, Walker closed Figma's "investigation" into Goren's comments.

232. HR had readily accepted Goren's inexplicable defense that she had said, "Kimber and Serry having SEVs."

233. HR hadn't investigated at all—Walker didn't interview any of the (many) witnesses to Goren's comment, many of whom had confirmed directly to Park that she'd said "sex." Nor did he ask Park or, it seems, Goren any follow-up questions.

234. He messaged Park to thank her for "clarify[ing] the misunderstanding," falsely claiming that Goren's "take on the story matches the details you shared."

235. Park was shocked and outraged.

236. That wasn't what happened at all.

237. Park had never validated Goren's story, nor had she left their conversation feeling the issue had been resolved.

238. In fact, at the outset, Goren hadn't had a "story" at all—she'd told Park she didn't remember making any comment.

239. Forced to defend herself to HR, Park took pains to spell out the facial absurdity of Goren's excuse, noting "Kimber and Serry having SEVs" made no sense, at all.

240. Walker eventually decided HR should monitor their future discussions about the harassment.

241. Following one brief supervised confrontation between Goren and Park, Walker messaged Park to claim the incident was resolved, saying, "[f]rom my perspective, you and Mónica ended the convo (on this topic) in a good place."

242. Again, that was false, meant to paper over Figma's repeated failings to prevent and remedy workplace sexual harassment, and to bury Park's witness-corroborated side of the story.

### 9. Goren launches a discriminatory and retaliatory campaign against Park.

243. After Goren's and Park's HR-monitored conversation, Goren targeted Park with ramped-up harassment and hostility, including by publicly berating her, spreading lies about her, and punishing her with unearned low performance ratings.

244. As an example, when Park made a minor, fixable mistake on a rarely used piece of legacy code, Goren blew up at her, wrongly classifying it as a maximum-severity incident.

245. Park and several team engineers immediately requested a downgrade because the error had minimal impact, but Goren refused.

246. And in a retrospective meeting on December 2, 2025, Goren spent the first fifteen minutes publicly slamming Park, repeatedly demanding to know why she didn't know the legacy software's infrastructure.

247. Goren's interrogation was so aggressive that Park's teammates had to intervene.

248. They defended Park, saying they'd reviewed the code and deemed it safe.

249. Park was mortified and distressed.

250. After the meeting, Park's coworkers privately messaged her to check on her.

251. They said she was right to feel hurt, and that Goren's targeted hostility was out of line, and violated Figma's standard "blameless" retrospective policy.

252. Still, Goren escalated her retaliation.

253. The next day, Goren posted a message in the public project channel, asking Park, "any other changes you have been doing which have other breaking changes?"

254. This public humiliation prompted senior engineer R.F. to privately warn Park about Goren's discriminatory targeting and bullying.

255. R.F. messaged Park that Goren was pushing a false narrative to blame her—and he said that if *he'd* written the code, Goren wouldn't have treated him this way.

256. And Park's coworker P.N. noticed Goren's bias, too, saying he didn't know why Goren was "so much harder" on Park than on others.

257. It was clear to Park—and to anyone watching—that Goren was punishing Park, and only Park, and was set on destroying her career.

258. Goren targeted Park because of Park's sex, sexual orientation, and race, and in retaliation for the sexual harassment report against Goren and Park's opposition to Goren's harassment.

### 9.1. Figma HR dismisses Park's retaliation report and defends Goren's harassment and hostility.

259. On December 4, Park reported Goren's escalating retaliation to Walker, sharing her fear that Goren would derail her career.

260. She noted that other coworkers had observed and commented on Goren's harassment and retaliation, and shared proof, including by attaching screenshots of R.F.'s messages.

261. In response, Walker arranged a meeting with Park and told her to "come prepared with concrete examples" of Goren's retaliation.

262. But Park already had provided concrete examples, including in R.F.'s messages.

263. As he'd done before, Walker ignored the evidence.

264. After their meeting, Walker dismissed Park's retaliation complaint entirely.

265. Again, he defended Goren, writing that although her public bullying was "perhaps direct," it remained "within her reasonable authority" and "within the bounds of her management authority," never mind that it violated the company's policies for retrospectives, and that it had been severe enough to prompt intervention and comment from several of Park's colleagues.

266. Park pushed back, and shared her concerns that Goren was targeting her because of the sexual harassment report (a report A.F.—*not Park*—had made).

267. To this, Walker toed the company line, instructing Park again to confront Goren "directly" with any "upward feedback."

### 10. Goren continues retaliating, blindsiding Park with an unfounded negative performance review.

268. In H1 2026, Goren rated Park's performance as a 2 out of 5, i.e., "Inconsistent (Inconsistently Meeting Expectations)."

269. This came as a shock to Park.

270. This was her first negative performance review on the Extensibility team, and Goren had not raised any performance-related concerns with Park until then.

271. Goren's 2-rating automatically slashed Park's year-end bonus from an expected 116% down to 35% of the target bonus for her level (she'd been on track for at least a "4" rating) and affected her salary raise and equity refresh grant the following year.

272. Worse, this performance review compounded existing professional damage.

273. Park already had been forced to restart her promotion and performance timeline from scratch in 2024, after she endured an effective demotion (her only option to escape her harasser), costing her a promotion she should've earned that year.

274. Now, Goren's false performance review put that promotion entirely out of reach.

275. Figma's pattern of post-harassment retaliation caused Park significant economic damages, again and again—if she'd been promoted to L4, as she was supposed to be (in 2024 or even 2025), and given the performance ratings she'd earned, her salary raises, equity grants, and bonuses would've been hundreds of thousands of dollars higher than what she was left with in 2026.

276. In short, Park suffered a career wipeout, all while similarly situated men on her teams—who hadn't been harassed—continued to receive promotions, raises, and bonuses.

277. When Park told Goren that this was the first time she was hearing any negative feedback about her work, Goren falsely claimed that Park "should have known" given the negative feedback in Park's H2 2025 review.

278. This was nonsense, and Park pushed back, reminding Goren that her H2 2025 feedback was an entirely positive, "meets expectations" and "on track" rating.

### 11. Figma HR again dismisses Park's retaliation claim and falsely concludes that her sexual harassment complaint against Goren was unsubstantiated.

279. Park reported Goren's retaliatory review to HR on March 13, 2026.

280. Rather than investigate the sudden downgrade of a previously "On Track" employee, Walker again dismissed Park's retaliation complaint and stood by Goren and her evaluation.

281. Then, having provided no updates since November, Walker announced out of the blue that HR could not "substantiate" Park's sexual harassment complaint, formally accepting Goren's false and inane "SEVs" defense, writing that given the "environment in the lunch space," it was "possible that 'SEV' was misheard by everyone as 'sex.'"

282. Park reminded Walker that Goren initially admitted having no recollection of the event, and that she had brainstormed the "SEVs" excuse during their one-on-one confrontation.

283. Park also pointed out that multiple coworkers sat at the lunch table and heard the comment.

284. Walker would not say whether these individuals had been interviewed as part of Figma's "investigation."

285. Park also flagged that Goren had violated HR's confidentiality directives, talking to her subordinates about the incident in one-on-ones—including to intimidate witnesses—despite clear instructions not to discuss the case.

### 12. Park develops PTSD symptoms and is forced to take mental health leave.

286. All this severely impacted Park's health.

287. On March 13, 2026, Park warned HR that "the stress of everything has taken a toll on me."

288. Figma ignored her.

289. Left with no other way to protect her physical and mental well-being, on March 24, Park had to step away from her career and take mental health leave.

290. Park's physician treated her for PTSD symptoms and generalized anxiety.

291. Her medical charts document severe symptoms, including "intrusive and obsessive thoughts, worry, difficulty with sleep, dread, [and a] sense something bad will happen."

292. To cope with the psychological damage Figma inflicted, Park required a treatment plan including talk therapy and psychiatric medications.

293. Even when she was finally cleared to return to work nearly three months later, on June 16, 2026, she was not fully recovered.

294. Her physician required Figma to implement strict medical restrictions, including a graduated work schedule and mandatory remote workdays, simply to allow Park safely to re-enter the workplace.

### 13. Goren's repeated discrimination and harassment hollow out her team while Figma stands by.

295. Senior engineer R.F. recently resigned, dedicating a significant portion of his exit interview to documenting his concerns with Goren's behavior.

296. Before he left, R.F. told Park that he had been working weekends and holidays, including Thanksgiving, because he was afraid Goren would punish *Park* for any of his (R.F.'s) unfinished tasks.

297. Shortly after R.F.'s departure, the team's highest-ranking remaining engineer, K.N., also resigned.

298. K.N. saw firsthand how Goren discriminated against Asian women—treating them worse than others—including Park, and another Figma employee, G.L.

299. G.L. was a highly respected engineer and the team's first female hire.

300. G.L. had nearly five years of technical experience.

301. Yet within six months of taking over G.L.'s team, Goren forced G.L. out, issuing her a punitive, false PIP.

302. Although K.N. repeatedly advocated for G.L., Figma continued to side with Goren, and wouldn't budge. So, K.N. ultimately advised her to interview elsewhere and bypass Goren for professional references.

303. Despite repeated complaints about Goren's discrimination, harassment, and retaliation, and despite the departures of senior talent in protest of Figma's refusals to discipline Goren and its unquestioning loyalty to her, Figma continued to enable and reward Goren, endangering Park and the employees who remained.

### 14. After Park puts Figma on notice of her intent to sue, Figma retaliates again.

304. In July 2026, days after CEO Dylan Field and others learned via a letter from Park's counsel that Park was represented, Park's supervisor, Tommy MacWilliam, asked Park to transfer to a new team, on the pretext that a transfer would help Park avoid Goren.

305. MacWilliam's request is retaliatory.

306. A transfer, for Park and others at Figma, is an effective demotion, resetting promotion eligibility. Park suffered such a demotion once already, and it caused her career irreparable damage.

307. Another transfer would set her back even further. And it would strip her of the opportunity to work in her area of expertise (backend infrastructure).

308. Years later, Figma and Field's playbook hasn't changed—they still force harassment victims to make personal and professional sacrifices to fix Figma's sexual harassment problem.

## 15. Figma's Confront-Your-Harasser Policy comes from the top—from Figma's CEO, Dylan Field.

309. Figma's Confront-Your-Harasser Policy is not the work of a few rogue managers.

310. Two different managers, Park's Lead People Partner, and Figma's HR team, over three years and in response to two different harassers, gave Park the same instruction: deal with your harasser yourself, directly.

311. In 2023, Figma HR told Park to confront her harasser *herself*. In 2024, Froese told her that at her "level," she should easily be able to resolve "conflict" with her teammates, and that separating her from her harasser would just be "avoiding the problem." And in late 2025, Walker told her to contact Goren *herself*—and then to take any "upward feedback" to Goren "directly."

312. That approach did not originate with Emerson, Froese, or Walker. It reflects a culture of "direct feedback" that comes from Figma's Co-Founder, CEO, President, and Board Chair Dylan Field.

### 15.1. Field controls Figma, and everyone in it.

313. Field co-founded Figma and has served as its CEO since 2012.[1] Today, he is also Figma's President and the Chair of its Board of Directors.[2]

314. Field also controls Figma's stockholder vote. According to Figma's 2026 proxy statement, Field controls 72.3% of the company's total voting power—through his own Class B shares, which carry 15 votes each, and through an irrevocable proxy to vote his co-founder's shares.[3]

---

[1] Eric Revell, *Figma is going public, and the CEO was a fellow at Peter Thiel's foundation*, Fox Business (July 31, 2025), https://www.foxbusiness.com/markets/figma-going-public-ceo-fellow-peter-thiels-foundation.

[2] Figma, Inc., Annual Report (Form 10-K) for the fiscal year ended December 31, 2025 (Feb. 18, 2026) ("2025 Form 10-K"), https://s206.q4cdn.com/973901332/files/doc_financials/2025/q4/fig-20251231.pdf.

[3] Figma, Inc., Definitive Proxy Statement (Schedule 14A) at 33, 35, 42 (Apr. 22, 2026) ("2026 Proxy Statement"), https://www.sec.gov/Archives/edgar/data/1579878/000162828026026641/fig-20260421.htm; *see also* Dylan Field, Statement of Beneficial Ownership (Schedule 13D) (Oct. 28, 2025), https://www.sec.gov/Archives/edgar/data/2073586/000162828025046776/xslSCHEDULE_13D_X01/primary_doc.xml.

315. Because Field controls a majority of the vote, Figma qualifies as a controlled company under New York Stock Exchange rules.[4] As Figma has told investors, Field has "the ability to control the outcome of matters submitted to our stockholders for approval[.]"[5]

316. Figma's Board, in turn, has explained that Field "is best positioned to identify strategic priorities, lead critical discussion, and execute our business plans."[6]

317. Field does more than set strategy. Field sets the terms and conditions of Figma employees' work. In August 2020, Field personally announced the hybrid work model that governs where and when Figma employees work—the model under which Figma opened the New York City hub where Park works.[7]

318. And in January 2024, Field personally reset Figma employees' equity compensation. In a company-wide Slack message, Field announced additional equity for employees hired in the sixteen months after Adobe announced its proposed acquisition of Figma, changes to the rules for equity refresh grants, and a one-time "Detach" program that paid any employee who voluntarily left three months' salary.[8]

319. Park, whom Figma hired in October 2022, was among the employees whose equity Field reset. In other words, Field had authority over and did decide, or at minimum ratified, Park's discriminatorily low pay on account of her gender.

---

[4] 2026 Proxy Statement at 7.

[5] Figma, Inc., Prospectus (Form 424(b)(4)) (July 30, 2025) ("IPO Prospectus"), https://www.sec.gov/Archives/edgar/data/1579878/000162828025037014/figma424b4.htm.

[6] 2026 Proxy Statement at 8.

[7] Ellen Glover, *Design Startup Figma Just Opened a New 'Hub' in NYC and Is 'Growing Like Crazy,'* Built In (June 22, 2021) ("Built In Article"), https://builtin.com/articles/figma-nyc-hub-hiring.

[8] Alex Konrad, *Figma Offers Employees Shares And Buyouts After Collapsed Adobe Deal*, Forbes (Jan. 23, 2024), https://www.forbes.com/sites/alexkonrad/2024/01/23/figma-offers-employees-shares-buyouts-after-collapsed-adobe-deal/; *see also* Akash Sriram, *Figma to Boost Employee Equity Packages After Adobe's $20 Billion Deal Collapses*, Reuters (Jan. 23, 2024), https://www.reuters.com/technology/figma-boost-employee-equity-packages-after-adobes-20-bln-deal-collapses-source-2024-01-23/.

320. Figma's People organization—its HR function—includes Walker, who works under Figma's Chief People Officer. The Chief People Officer reports to Field.[9]

321. Figma's Code of Conduct directs employees with concerns to their manager, their People Partner, Figma's Chief People Officer, Figma's General Counsel, or a third-party ethics hotline. The Code was established by Figma's Board of Directors—which Field chairs and controls—and the Board oversees compliance with it, directly or through its Audit Committee.[10]

### 15.2. Field built the "direct feedback" culture that Figma uses to force victims to confront their harassers.

322. Field personally selected Figma's values. In an interview, Field explained that Figma's vision and mission were his call as founder, and that, after surveying employees, he "ended up picking" the company's values.[11]

323. Field has also described how, after Figma's early culture suffered because of failures in his leadership, he attempted a course correction—including by "articulating values that mattered" to his team.[12]

324. Today, Figma has five official cultural values. One of them—a value Field has personally invoked as core to Figma[13]—is "Grow As You Go." As Figma describes that value, everyone is a

---

[9] *See Figma Org Chart*, The Org, https://theorg.com/org/figma (last visited Nov. 16, 2026).

[10] Figma, Inc., Code of Conduct (2025), https://s206.q4cdn.com/973901332/files/doc_downloads/governance_docs/2025/Figma-Code-of-Conduct.pdf.

[11] Jordan Crook, *Figma CEO Dylan Field Discusses Fundraising, Hiring and Marketing in Stealth Mode*, TechCrunch (Aug. 20, 2020), https://techcrunch.com/2020/08/20/figma-ceo-dylan-field-discusses-fundraising-hiring-and-marketing-in-stealth-mode.

[12] *Dylan Field: Leadership is a Journey*, Index Ventures (Dec. 17, 2020), https://www.indexventures.com/perspectives/dylan-field-leadership-is-a-journey/.

[13] *Uniquely Led: Dylan Field*, Lattice (Oct. 4, 2021) ("Lattice Interview"), https://www.lattice.com/uniquely-led/dylan-field.

work in progress, so "Figmates" "share the **direct** feedback we all need to become great at what we do."[14]

325. Field signed the annual report that publishes that value to Figma's investors—a report that also represents that Figma embeds its five cultural values in how "Figmates" work every day.[15]

326. Field has also made clear what he wants from Figma's People function. When asked what he looks for in the leader of Figma's People team, Field said that HR must "go out beyond compliance" and focus on building a culture of growth.[16] But Figma's culture of growth focuses solely on personal growth for perpetrators of sexual harassment at victims' expense.

327. A "direct feedback" culture may suit code reviews and design critiques, but it has failed miserably to address Figma's sexual harassment problem.

328. When Park reported sexual harassment, Figma did not investigate, discipline, or separate. Instead, it treated her complaints as interpersonal "conflict" to be resolved through direct feedback—and sent her back to her harassers repeatedly.

329. Figma's Confront-Your-Harasser Policy is the product of Field's values, set and enforced from the top. This is supported by (a) Field's personal role in selecting, articulating, and publishing Figma's values, including "Grow As You Go"; (b) Field's control of Figma, its Board, and its People organization (Figma's People organization trains and instructs managers and People Partners to respond to employee concerns, including harassment complaints, by directing the employee to give "direct feedback" to the person involved. Park received identical instructions supporting this from Emerson, Froese, Walker, and Figma's HR, and on Walker's instruction that Park take her concerns about Goren to Goren "directly," as "upward feedback"); (c) the uniform application of the same

---

[14] 2025 Form 10-K (emphasis added).

[15] 2025 Form 10-K.

[16] Lattice Interview.

"direct feedback" response to Park's harassment complaints by different managers and HR personnel, on different teams, over three years; and (d) the language those managers and HR used when they refused to intervene—telling Park to raise her concerns "directly," as "upward feedback," to resolve "conflict" herself, and to speak up—which is identical to the "direct feedback" norm in the Figma values Field chose and publishes.

### 15.3. Field knows how a lawful harassment process works, yet he chose this one.

330. Field knows that Figma must maintain lawful anti-harassment policies. In 2025, he signed a statement, approved by Figma's Board, representing that Figma had adopted policies or implemented employee training on "Anti-Harassment and Discrimination."[17]

331. New York law requires every employer's sexual harassment prevention policy to provide a procedure for "the timely and confidential investigation of complaints."[18]

332. And for nearly three decades, the law has recognized that a reasonable complaint process lets harassment victims bypass their harassers.

333. On paper, Figma offers several reporting channels. But a channel that ends with the victim being told to confront her harasser is no bypass at all. Park used Figma's channels—her managers and HR—and each time, Figma sent her back to the person harassing her.

334. That is the point. As alleged above, Figma's approach deters harassment complaints. And Field, who controls Figma and its People organization, has kept it in place purposely.

335. Field knew that Figma's managers and HR employees in his reporting chain were directing harassment victims to confront their harassers, and that harassment complaints like Park's were going uninvestigated. After all, Field controls Figma's People organization and its Chief People

---

[17] Figma, Inc., Modern Slavery Act Statement for the fiscal year ending December 31, 2024 (approved by Board of Directors June 22, 2025), https://static.figma.com/uploads/c8f890315824d4aea5746613bae0dbe1ecd4e527.

[18] N.Y. Lab. Law § 201-g(1)(a)(iv), (b).

Officer (his direct report); the Board, which he chairs, ostensibly oversees compliance with Figma's Code of Conduct; the repeated internal complaints about Goren from Park, R.F., K.N., and others, including in R.F.'s exit interview, would have put him on notice; and the departures of valuable senior engineers in protest of Figma's refusal to act should have too.

336. On June 26, 2026, Park, through counsel, notified Field and Figma General Counsel Brendan Mulligan in writing of her claims (reproduced in part below). Yet Field did nothing to examine or change Figma policy or to stop the retaliation that followed. Days later, MacWilliam asked Park to transfer teams—the same "solution" Figma had pushed on her in 2023.

**SEPPINNI LAW**

40 BROAD ST., 7TH FL., NEW YORK, NY 10004 | OFFICE: (212) 859-5085

WRITER'S EMAIL:
JOHN@SEPPINNILAW.COM

WRITER'S DIRECT LINE:
+1 (929) 552-9791

June 26, 2026

**Via Email and USPS**

Dylan Field, CEO, President & Co-founder
Brendan Mulligan, General Counsel and Secretary
Figma, Inc.
760 Market Street, Floor 10
San Francisco, California 94102
[redacted]

**RE: DOCUMENT PRESERVATION DEMAND RE ANTICIPATED CLAIMS OF SERRY PARK**

Mr. Field and Mr. Mulligan:

Seppinni Law represents Figma employee Serry Park with respect to her claims for sexual harassment, retaliation, sex and sexual orientation discrimination, and hostile work environment under New York State Human Rights Law, New York City Human Rights Law, and Title VII of the Civil Rights Act of 1964 (among other causes of action), against Figma, Inc. (Figma), its agents, and its employees in their personal and professional capacities.

Please confirm that Figma, its agents, and its employees are subject to a litigation hold regarding these matters and that they are preserving, and are not deleting, modifying, or otherwise discarding all potentially relevant evidence, on their corporate and personal devices including but not limited to:

337. Field has never changed his Confront-Your-Harasser Policy. Figma still applies it today. For example, MacWilliam's July 2026 request that Park transfer teams to avoid Goren again placed the burden on Park, not on her harasser, when Walker's "direct" "upward feedback" instruction didn't work.

### 15.4. Field directs Figma's business in New York, where Park works.

338. Figma opened its New York City hub in 2021, under the hybrid work model Field announced.[19]

339. In March 2025, Figma announced a $14.79 million expansion of its Manhattan office at 27 West 23rd Street, committing to create 242 new jobs there in exchange for up to $2.1 million in New York State Excelsior tax credits. At the time, more than 280 Figmates were based in the New York area.[20]

340. Field—as Figma's controlling stockholder, CEO, and Board Chair—knew of, consented to, and controlled Figma's New York operations and expansion, which were undertaken for his benefit.

341. Park works in New York City, and the Confront-Your-Harasser Policy that Field created, maintains, and enforces was applied to her, and injured her, in New York City.

342. Put simply: Figma's Confront-Your-Harasser Policy is Field's policy.

---

[19] Built In Article.

[20] Press Release, Empire State Dev., *Empire State Development Announces $14.79 Million New York City Expansion by Design Software Leader Figma* (Mar. 5, 2025), https://www.esd.ny.gov/esd-media-center/press-releases/esd-announces-14-79-million-new-york-city-expansion-design-software-leader-figma.

## CAUSES OF ACTION

### CAUSE OF ACTION 1
### 42 U.S.C. § 1981
### *Race Discrimination*
### (Against Figma)

343. Park incorporates the prior paragraphs.

344. Park is Asian.

345. Park's employment with Figma is a contractual relationship protected by § 1981, which guarantees her the same right as white employees to the making, performance, modification, and termination of that contract, and to the enjoyment of all of its benefits, privileges, terms, and conditions. 42 U.S.C. § 1981(a)–(b).

346. Froese and Goren, acting as Park's supervisors and as Figma's agents, discriminated against Park in the terms and conditions of her employment because of her race.

347. After Park reported sexual harassment to Froese and asked to be kept off her harasser's projects, Froese told her that, at her "level," she should easily be able to resolve "conflict," and that separating her from her harasser would just be "avoiding the problem." That rebuke traded on the stereotype that Asian women are meek, timid, passive, and conflict-averse. Froese then recommended issuing Park a negative performance rating (2 out of 5), including because of her failure to "speak up" and lack of "presence," and Figma adopted his recommendation. Non-Asian employees raised concerns about colleagues and were not faulted for failing to "resolve conflict" or downgraded.

348. Goren, too, treated Park worse than non-Asian employees. K.N., who was the team's highest-ranking remaining engineer before resigning, saw firsthand that Goren treated Asian women—including Park and G.L.—worse than others. Within six months of taking over G.L.'s team, Goren forced G.L. out with a punitive, false PIP.

349. Goren singled out Park in the same way. She publicly berated Park over a minor, low-impact error, in violation of Figma's "blameless" retrospective policy; senior engineer R.F. told Park

that Goren would not have treated him that way had he written the code; and P.N. remarked that Goren was "so much harder" on Park than on others. Then, for H1 2026, Goren rated Park a 2 out of 5—Park's first negative rating on the Extensibility team, after two consecutive "On Track" reviews from Goren herself—slashing Park's bonus from an expected 116% to 35% of target and depressing her raise and equity refresh. Non-Asian engineers on Goren's team who performed comparably were not publicly criticized, or were rated higher.

350. Park's race was a but-for cause of this treatment. Had Park not been Asian, Froese would not have dismissed her as too passive to resolve "conflict" with her harasser and recommended rating her a "2" for it, and Goren would not have singled her out—as she singled out other Asian women—for public blame and an unearned negative rating.

351. Figma is liable for this discrimination. Froese and Goren carried it out as Park's supervisors, through Figma's performance-rating and compensation systems. And Figma adopted and enforced their decisions. Figma adopted Froese's recommended low rating and put Park on a coaching plan, and when Park reported Goren's rating, Figma—through Walker—stood by it.

352. As a direct and proximate result of these violations of § 1981, Park suffered and continues to suffer harm, including economic loss and emotional distress, for which she is entitled to an award of damages, to the greatest extent permitted under law, along with attorneys' fees and expenses.

353. Figma's conduct constitutes bad faith, malicious, willful, and wanton violations of § 1981 for which Park is entitled to an award of punitive damages.

## CAUSE OF ACTION 2
### N.Y. Lab. Law § 194 (New York Equal Pay Act)
### *Unequal Pay Based on Sex, Race, and Sexual Orientation*
### (Against Figma and Field)

354. Park incorporates the prior paragraphs.

355. Figma and Field are Park's employers under the New York Labor Law, which defines "employer" to include "any person, corporation, limited liability company, or association employing any individual in any occupation, industry, trade, business or service." N.Y. Lab. Law § 190(3). Field is Park's employer for the reasons alleged above.

356. Section 194 prohibits paying an employee with status within one or more protected classes less than employees without that status for equal work, or for "substantially similar work, when viewed as a composite of skill, effort, and responsibility," performed under similar working conditions. N.Y. Lab. Law § 194(1). Those protected classes include sex, race, and sexual orientation. *Id.* § 194(2)(b).

357. Park is an Asian woman, and she is queer.

358. Figma paid Park less than male, non-Asian, and non-queer employees in the same establishment for equal or substantially similar work.

359. The pay differential was not based on a seniority system, a merit system, a system that measures earnings by quantity or quality of production, or a bona fide factor other than status within a protected class.

360. Figma's and Field's violations were willful. Figma has continued to pay Park less than her male comparators even after Park's counsel notified Field and Figma's General Counsel, on June 26, 2026, of her claims of sex discrimination.

361. Under N.Y. Lab. Law § 198(1-a), Park is entitled to recover the full amount of her underpayment, liquidated damages of up to three hundred percent of the total amount of the wages found to be due for Figma's and Field's willful violations of § 194, and her reasonable attorneys' fees.

## CAUSE OF ACTION 3
### New York State Human Rights Law (NYSHRL), N.Y. Exec. Law §§ 296(1)(a), 300
### *Discrimination*
### (Against Figma)

362. Park incorporates the prior paragraphs.

363. Figma is Park's employer under the NYSHRL. The NYSHRL must be construed liberally to accomplish its remedial purposes, "regardless of whether federal civil rights laws, including those laws with provisions worded comparably to the provisions of this article, have been so construed." N.Y. Exec. Law § 300.

364. Figma discriminated against Park in compensation and in the terms, conditions, and privileges of her employment because of her sex, race, and sexual orientation, in violation of N.Y. Exec. Law § 296(1)(a).

365. Among other things, Figma (a) refused, in 2023 and again after Froese became her manager, to separate Park from the coworker who was sexually harassing her, and told her instead to confront him; (b) forced Park off her team in April 2024—an effective demotion that reset her performance and promotion clock, derailed her 2024 promotion from Level 3 to Level 4, and cut her future salary, bonus, and equity; (c) issued her a negative performance review and rating (2—inconsistent) that faulted her for not speaking up, on Froese's recommendation; (d) through Goren, subjected her to a sexual comment about her and her wife in front of her colleagues, and then to public hostility that her colleagues attributed to Goren's bias; and (e) rated her a 2 out of 5 for H1 2026, cutting her bonus from an expected 116% to 35% of target and depressing her raise and equity refresh.

366. Figma did these things because of Park's sex. Her managers dismissed her reports of sexual harassment as romance—Emerson and Froese each told her he had met his own spouse or partner at work—and treated the harassment as a "conflict" for Park to resolve on her own. Similarly situated men on Park's teams, who had not been sexually harassed, continued to receive promotions, raises, and bonuses.

367. Figma did these things because of Park's race. Froese's criticism of Park as unable to resolve "conflict," and the performance review's criticism of her for not "speaking up," invoked stereotypes of Asian women as meek and passive; and Goren treated Asian women on her team, including Park, worse than others.

368. Figma did these things because of Park's sexual orientation. Goren told Park's colleagues that Park and her wife had been talking about "having sex"—a comment trading on the stereotype that queer women are hypersexual—and, when Park confronted her, insisted she never would have said it because she "has a lot of gay friends."

369. Figma is liable for the discriminatory conduct of Park's supervisors and HR personnel, which it knew of and failed to correct.

370. As a direct and proximate result of Figma's violations of the NYSHRL, Park suffered and continues to suffer harm, including economic loss and emotional distress, for which she is entitled to an award of damages, to the greatest extent permitted under law, along with attorneys' fees and expenses.

371. Figma's conduct constitutes bad faith, malicious, willful, and wanton violations of the NYSHRL for which Park is entitled to an award of punitive damages.

## CAUSE OF ACTION 4
### New York State Human Rights Law, N.Y. Exec. Law §§ 296(1)(h), 300
### *Sexual Harassment*
### (Against Figma)

372. Park incorporates the prior paragraphs.

373. The NYSHRL makes it unlawful for an employer to subject an employee to harassment because of her sex, race, or sexual orientation, or because she opposed practices the NYSHRL forbids, "regardless of whether such harassment would be considered severe or pervasive under precedent applied to harassment claims." N.Y. Exec. Law § 296(1)(h). Harassment is unlawful when it subjects an employee "to inferior terms, conditions or privileges of employment because of the individual's membership in one or more of these protected categories." *Id.*

374. Figma subjected Park to harassment because of her sex, race, and sexual orientation, and because she opposed sexual harassment and retaliation.

375. Park's Onboarding Mentor sexually harassed her. After Park rejected his advances, he kept pursuing her: he stared at her all night at Figma's holiday party and followed her to her table; he sent her repeated unsolicited text messages after a New York City offsite, until she blocked him; and at another offsite, he paced back and forth past her desk to stare at her and inserted himself, uninvited, into a game she was playing with coworkers.

376. Figma knew of this sexual harassment and let it continue. When Park reported it, Emerson dismissed it, told her she should transfer if she was unhappy, and then assigned her harasser to the first significant project Park led; Figma's HR told her to confront her harasser herself; and when Froese replaced Emerson, he too refused to separate them, calling separation "avoiding the problem." Figma never disciplined her harasser, who still works there.

377. Goren, Park's manager, sexually harassed Park in October 2025, announcing to Park's colleagues at a company offsite lunch that the team had been talking about Park and her wife "having sex." After a colleague reported the comment, Goren contacted Park about it directly, tried to learn

who else had heard it, and then subjected Park to escalating public hostility—including a fifteen-minute public interrogation in a December 2, 2025, retrospective that her teammates had to interrupt, and a message in a public channel the next day suggesting that Park was responsible for other "breaking changes."

378. Figma's HR again sided with the harasser. Walker told Park to confront Goren herself; closed the investigation the next day based on Goren's own message, without confirming it with Park or interviewing the witnesses; accepted Goren's claim that she had said "SEVs"; dismissed Park's complaint that Goren was retaliating against her; and told Park to take any "upward feedback" to Goren "directly." In March 2026, Walker declared Park's sexual harassment complaint unsubstantiated.

379. This harassment subjected Park to inferior terms, conditions, and privileges of employment because of her sex, race, and sexual orientation, and because she opposed sexual harassment and retaliation. Figma made Park work alongside, and under, her harassers; made her confront them alone as the price of reporting them; forced her to give up her team and her promotion track to escape one of them; and, ultimately, drove her to take nearly three months of medical leave for the PTSD symptoms and anxiety the harassment caused.

380. This conduct rose far above what a reasonable victim of discrimination with Park's protected characteristics would consider petty slights or trivial inconveniences.

381. Figma's harassment of Park was a continuing violation. From her Onboarding Mentor's first advances, weeks after Park joined Figma, through Goren's and Walker's conduct in 2025 and 2026, Figma met each report of harassment the same way—refusing to meaningfully investigate, discipline, or separate, and sending Park back to her harasser—under the same Confront-Your-Harasser Policy.

382. Figma is liable for this harassment. Park's supervisors and Figma's HR personnel carried out much of it, and Figma knew of the rest—Park and her colleagues reported it—and failed to take appropriate corrective action.

383. As a direct and proximate result of Figma's violations of the NYSHRL, Park suffered and continues to suffer harm, including economic loss and emotional distress, for which she is entitled to an award of damages, to the greatest extent permitted under law, along with attorneys' fees and expenses.

384. Figma's conduct constitutes bad faith, malicious, willful, and wanton violations of the NYSHRL for which Park is entitled to an award of punitive damages.

## CAUSE OF ACTION 5
### New York State Human Rights Law, N.Y. Exec. Law §§ 296(1)(e), 296(7), 300
### *Retaliation*
### (Against Figma)

385. Park incorporates the prior paragraphs.

386. The NYSHRL makes it unlawful for an employer to "discharge, expel or otherwise discriminate against any person because he or she has opposed any practices forbidden under this article," N.Y. Exec. Law § 296(1)(e), and for "any person" to retaliate against an employee because she "opposed any practices forbidden under this article," filed a complaint, or "requested a reasonable accommodation under this article," *id.* § 296(7).

387. Park engaged in protected activity. She reported sexual harassment to Emerson and to Figma's HR, and later to Froese, and asked to be separated from her harasser. She opposed Goren's sexual harassment in November 2025, including by disputing Goren's "SEVs" excuse to HR. She reported Goren's retaliation to Walker on December 4, 2025, and again on March 13, 2026. She requested reasonable accommodations for her mental health conditions when she returned from medical leave on June 16, 2026, with the medical restrictions her physician required. And on June 26, 2026, through counsel, she notified Field and Figma's General Counsel in writing of her claims under the NYSHRL.

388. Froese retaliated against Park. After Park reported sexual harassment to Froese and asked to be separated from her harasser, Froese told her she should be able to resolve "conflict" at her "level," and then recommended issuing her a performance rating of a 2 (inconsistent), based on her failure to confront her harasser and "speak up." Figma adopted the negative rating and then put Park on a coaching plan.

389. Goren retaliated against Park. After learning of the harassment report, Goren tried to learn who else had heard her comment; publicly berated Park in the December 2, 2025, retrospective; posted a message in a public channel the next day suggesting that Park was responsible for other

"breaking changes"; spoke with her subordinates about the investigation despite HR's confidentiality directives; and then rated Park a 2 out of 5 for H1 2026, cutting Park's bonus from an expected 116% to 35% of target.

390. Walker retaliated against Park. In response to her complaints, he required her to confront Goren herself, closed the investigation based on Goren's own message without confirming it with Park or interviewing witnesses, dismissed her retaliation complaint as within Goren's "reasonable authority," told her again to take any "upward feedback" to Goren "directly," stood by Goren's retaliatory rating, and declared Park's harassment complaint unsubstantiated. Requiring an employee to confront her harasser as the price of complaining—and then closing her complaint—would dissuade a reasonable employee from complaining at all.

391. MacWilliam retaliated against Park. In July 2026—weeks after Park returned from medical leave with medical restrictions, and days after her counsel's letter—MacWilliam asked Park to transfer to a new team, rather than move Goren.

392. Each of these actions followed closely on Park's protected activity and was taken because of it.

393. Figma is liable for its own retaliation and for the retaliation of Goren, Froese, Walker, and MacWilliam, each of whom acted as Park's supervisor or as Figma's HR representative, and whose retaliation Figma knew of and condoned.

394. As a direct and proximate result of Figma's, Goren's, Froese's, Walker's, and MacWilliam's violations of the NYSHRL, Park suffered and continues to suffer harm, including economic loss and emotional distress, for which she is entitled to an award of damages, to the greatest extent permitted under law, along with attorneys' fees and expenses.

395. Figma's, Goren's, Froese's, Walker's, and MacWilliam's conduct constitutes bad faith, malicious, willful, and wanton violations of the NYSHRL for which Park is entitled to an award of punitive damages.

## CAUSE OF ACTION 6
**New York State Human Rights Law, N.Y. Exec. Law § 296(6)**
***Aiding and Abetting***
**(Against Field)**

396. Park incorporates the prior paragraphs.

397. The NYSHRL makes it unlawful "for any person to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this article, or to attempt to do so." N.Y. Exec. Law § 296(6).

398. Figma violated the NYSHRL by discriminating against, harassing, and retaliating against Park, as alleged above. Field actually participated in, and aided and abetted, Figma's violations and the violations of the other wrongdoers.

399. Field created, maintains, and enforces the Confront-Your-Harasser Policy that Figma applied to Park again and again. As alleged above, Field knew that Figma's managers and HR were directing harassment victims to confront their harassers and leaving their complaints uninvestigated. And after Park's counsel notified him in writing of her claims on June 26, 2026, Field did nothing to stop the harassment and retaliation. Days later, MacWilliam asked Park to transfer teams.

400. As a direct and proximate result of Field's violations of the NYSHRL, Park suffered and continues to suffer harm, including economic loss and emotional distress, for which she is entitled to an award of damages, to the greatest extent permitted under law, along with attorneys' fees and expenses.

401. Field's conduct constitutes bad faith, malicious, willful, and wanton violations of the NYSHRL for which Park is entitled to an award of punitive damages.

## CAUSE OF ACTION 7
### New York City Human Rights Law (NYCHRL), N.Y.C. Admin. Code § 8-107(1)(a), (27)(a)
### *Discrimination and Harassment*
### (Against Figma)

402. Park incorporates the prior paragraphs.

403. The NYCHRL makes it unlawful for "an employer or an employee or agent thereof," because of a person's gender, race, or sexual orientation, "[t]o discriminate against such person in compensation or in terms, conditions or privileges of employment." N.Y.C. Admin. Code § 8-107(1)(a)(3). It likewise makes it unlawful for an employer or its agent to discriminate against an individual in compensation or other terms, conditions, or privileges of employment because of her status as a victim of sex offenses or stalking. *Id.* § 8-107(27)(a)(3).

404. The NYCHRL must be "construed liberally for the accomplishment of the uniquely broad and remedial purposes thereof." *Id.* § 8-130(a).

405. Figma treated Park less well because of her gender, race, and sexual orientation, and because she was a victim of stalking, as alleged above—including by sexually harassing her, refusing to separate her from the coworker stalking her, forcing her to confront her harassers, forcing her off her team, issuing her negative reviews and ratings, and cutting her pay.

406. Figma is liable for its own conduct and for that of its employees and agents. Emerson, Froese, and Goren exercised managerial or supervisory responsibility; Figma knew of Park's Onboarding Mentor's and Goren's discriminatory conduct and acquiesced in it or failed to take immediate and appropriate corrective action; and Figma should have known of that conduct and failed to exercise reasonable diligence to prevent it. *See id.* § 8-107(13)(b).

407. Figma's Confront-Your-Harasser Policy treats employees who report sexual harassment as parties to an interpersonal "conflict" and requires them, rather than the company, to stop the harassment by confronting their harassers. That policy subjected Park to inferior terms and conditions of employment because of her gender.

408. Figma's harassment of Park was a continuing violation. From her Onboarding Mentor's first advances after Park joined Figma, through Goren's and Walker's conduct in 2025 and 2026, Figma met each report of harassment the same way—refusing to meaningfully investigate, discipline, or separate, and sending Park back to her harasser—under the same Confront-Your-Harasser Policy.

409. As a direct and proximate result of Figma's violations of the NYCHRL, Park suffered and continues to suffer harm, including economic loss and emotional distress, for which she is entitled to an award of damages, to the greatest extent permitted under law, along with attorneys' fees and expenses.

410. Figma's conduct constitutes bad faith, malicious, willful, and wanton violations of the NYCHRL for which Park is entitled to an award of punitive damages.

## CAUSE OF ACTION 8
### New York City Human Rights Law, N.Y.C. Admin. Code § 8-107(7)
### *Retaliation*
### (Against Figma)

411. Park incorporates the prior paragraphs.

412. The NYCHRL makes it unlawful for "any person" to "retaliate or discriminate in any manner against any person because such person has (i) opposed any practice forbidden under this chapter," or has "(v) requested a reasonable accommodation under this chapter." N.Y.C. Admin. Code § 8-107(7). The retaliation "need not result in an ultimate action with respect to employment . . . or in a materially adverse change in the terms and conditions of employment"; it need only be "reasonably likely to deter a person from engaging in protected activity." *Id.*

413. Park engaged in protected activity. She reported sexual harassment in 2023 and again to Froese; she opposed Goren's sexual harassment in November 2025; she reported Goren's retaliation in December 2025 and March 2026; and her counsel notified Field and Figma's General Counsel of her claims on June 26, 2026. Park also requested reasonable accommodations: she asked Froese to keep her off the projects of the coworker stalking her, and on June 16, 2026, she returned from medical leave with medical restrictions for her mental health conditions.

414. Each of the following acts was reasonably likely to deter a person from engaging in protected activity: (a) Froese's negative performance review and his recommendation to Figma that Park be rated a 2 (inconsistent), including because she didn't "speak up," after her report to him and her request to be separated from her harasser; (b) Figma's retaliatory coaching plan, following her 2 rating; (c) Goren's efforts to learn who had heard and reported her comment, her public berating of Park on December 2 and 3, 2025, her discussions with subordinates about the investigation despite HR's confidentiality directives, and her H1 2026 rating of 2 out of 5; (d) Walker's repeated instructions that Park confront Goren herself, his closing of Figma's investigation based on Goren's own message, without confirming it with Park or interviewing witnesses, his dismissal of Park's retaliation

complaints, and his March 2026 declaration that her complaint was unsubstantiated; and (e) MacWilliam's July 2026 request that Park transfer teams—again resetting her promotion eligibility and taking her out of her area of expertise—days after her counsel's letter and weeks after her return from medical leave.

415. The Confront-Your-Harasser Policy itself—requiring employees who report harassment to confront their harassers alone—is reasonably likely to deter a person from reporting harassment.

416. Figma is liable for this retaliation, both for its own conduct and because an employer is liable for its employees' and agents' violations of any provision of § 8-107 other than subdivisions 1 and 2. N.Y.C. Admin. Code § 8-107(13)(a).

417. As a direct and proximate result of Figma's violations of the NYCHRL, Park suffered and continues to suffer harm, including economic loss and emotional distress, for which she is entitled to an award of damages, to the greatest extent permitted under law, along with attorneys' fees and expenses.

418. Figma's conduct constitutes bad faith, malicious, willful, and wanton violations of the NYCHRL for which Park is entitled to an award of punitive damages.

## CAUSE OF ACTION 9
### New York City Human Rights Law, N.Y.C. Admin. Code § 8-107(6)
### *Aiding and Abetting*
### (Against Field)

419. Park incorporates the prior paragraphs.

420. The NYCHRL makes it unlawful "for any person to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this chapter, or to attempt to do so." N.Y.C. Admin. Code § 8-107(6).

421. Figma violated the NYCHRL by discriminating against, harassing, retaliating against, and refusing to accommodate Park, as alleged above. Field actually participated in, and aided and abetted, Figma's violations.

422. Field created, maintains, and enforces the Confront-Your-Harasser Policy; knew that it was being applied to harassment victims; and did nothing after Park's counsel notified him of her claims.

423. As a direct and proximate result of Field's violations of the NYCHRL, Park suffered and continues to suffer harm, including economic loss and emotional distress, for which she is entitled to an award of damages, to the greatest extent permitted under law, along with attorneys' fees and expenses.

424. Field's conduct constitutes bad faith, malicious, willful, and wanton violations of the NYCHRL for which Park is entitled to an award of punitive damages.

## CAUSE OF ACTION 10
### New York City Human Rights Law, N.Y.C. Admin. Code § 8-107(28)
### *Failure to Engage in a Cooperative Dialogue*
### (Against Figma)

425. Park incorporates the prior paragraphs.

426. The NYCHRL makes it unlawful for "an employer . . . or an employee or agent thereof to refuse or otherwise fail to engage in a cooperative dialogue within a reasonable time with a person who has requested an accommodation or who the covered entity has notice may require such an accommodation," including an accommodation "[r]elated to a disability" or "[f]or such person's needs as a victim of [] sex offenses or stalking." N.Y.C. Admin. Code § 8-107(28)(a)(2), (4).

427. A cooperative dialogue is a good-faith written or oral dialogue about the person's accommodation needs, potential accommodations, including alternatives, and the difficulties those accommodations may pose. *Id.* § 8-102. At its conclusion, the employer must give the person a written final determination identifying any accommodation granted or denied. *Id.* § 8-107(28)(d).

428. Figma refused to engage in any cooperative dialogue about Park's needs. When Park asked Froese to keep her off projects with her harasser, Froese rejected the request outright—separation would be "avoiding the problem"—without discussing her needs, alternatives, or any difficulty an accommodation would pose, and Figma never gave Park a written final determination.

429. Figma and Walker likewise failed to engage in a cooperative dialogue when they were on notice that Park may require an accommodation related to a disability. On March 13, 2026, Park told Figma's HR, including Walker, that "the stress of everything has taken a toll on me." Figma ignored her. Eleven days later, Park had to take medical leave. Her physician treated her for PTSD symptoms and generalized anxiety—mental or psychological impairments that are disabilities under the NYCHRL, which defines "disability" as "any physical, medical, mental or psychological impairment, or a history or record of such impairment." *Id.* § 8-102.

430. As a direct and proximate result of Figma's violations of the NYCHRL, Park suffered and continues to suffer harm, including economic loss and emotional distress, for which she is entitled to an award of damages, to the greatest extent permitted under law, along with attorneys' fees and expenses.

431. Figma's conduct constitutes bad faith, malicious, willful, and wanton violations of the NYCHRL for which Park is entitled to an award of punitive damages.

## PRAYER FOR RELIEF

Plaintiff demands judgment against Defendants in an amount to be determined at trial for all available relief, whether it be equitable, statutory, or economic, including:

(a) declaring that Defendants' conduct violated 42 U.S.C. § 1981, the New York Equal Pay Act, the New York Labor Law, the NYSHRL, and the NYCHRL;

(b) enjoining Figma from requiring employees who report harassment to confront their harassers, and ordering Figma to adopt and enforce a complaint procedure that provides for the timely and confidential investigation of harassment complaints;

(c) ordering Figma to place Park in the Level 4 position, with the compensation, that she would have held absent Defendants' unlawful conduct;

(d) awarding Park back pay and front pay, including lost salary, bonuses, equity, and benefits;

(e) awarding Park compensatory damages, including for emotional distress and harm to her career;

(f) awarding Park liquidated damages under N.Y. Lab. Law § 198(1-a);

(g) awarding Park punitive damages under 42 U.S.C. § 1981, the NYSHRL, and the NYCHRL;

(h) awarding Park her reasonable attorneys' fees and costs;

(i) awarding Park pre- and post-judgment interest; and

(j) granting such other relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a jury trial.

**SEPPINNI LAW, PLLC**

*/s/ JOHN CRAIN*
JOHN CRAIN
MEGAN JONES
SHANE SEPPINNI

40 Broad St.
Floor 7
New York, NY 10004
+1 (917) 397-2847
john@seppinnilaw.com
megan@seppinnilaw.com
shane@seppinnilaw.com